IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Action |
| Plaintiff, | : | No. 2:14-cr-00012 |
| v. | : | |
| | : | Date: October 2, 2014 |
| GREGORY A. DOTSON, | : | |
| Defendant. | : | |

TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government: AUSA BLAIRE L. MALKIN
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713

For the Defendant: MICHAEL O. CALLAGHAN, ESQ.
Neely & Callaghan
159 Summers Street
Charleston, WV 25301-2134

Probation Officer: Michele Jones

Court Reporter: Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography; transcript produced by computer.

PROCEEDINGS had before The Honorable Thomas E. Johnston, Judge, United States District Court, Southern District of West Virginia, in Charleston, West Virginia, on October 2, 2014, at 2:29 p.m., as follows:

COURTROOM DEPUTY CLERK: The matter before the Court is the United States v. Gregory A. Dotson, criminal action number 2:14-cr-00012, scheduled for sentencing.

THE COURT: Good afternoon. Will counsel note your appearance?

MS. MALKIN: Blaire Malkin on behalf of the United States.

MR. CALLAGHAN: Good afternoon, Your Honor. Michael Callaghan on behalf of Greg Dotson. He is here with me today seated at counsel table.

THE COURT: All right. Good afternoon, Mr. Dotson, will you please stand, and I will ask the deputy clerk to administer an oath to you at this time.

COURTROOM DEPUTY CLERK: Please raise your right hand.

**GREGORY A. DOTSON, DEFENDANT, SWORN**

THE COURT: You may be seated.

Mr. Dotson, do you understand that you are now under oath and you must tell truth and, if you testify falsely, you may face prosecution for perjury or for making a false statement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Throughout the course of this

hearing, if there's anything that occurs that you don't understand, I want you to feel free to speak up and seek clarification.

Also, if at any time you need to confer with your attorney, I'll be pleased to pause the proceedings to allow you to do so.

Do you understand all that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Mr. Callaghan, have you received and read and reviewed with your client a copy of the Presentence Report?

MR. CALLAGHAN: I have, Your Honor.

THE COURT: Mr. Dotson, have you received and reviewed a copy of the Presentence Report with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Ms. Malkin, has the government received and reviewed a copy of the Presentence Report?

MS. MALKIN: Yes, Your Honor.

THE COURT: Am I correct in saying that there are no outstanding objections to the Presentence Report?

MS. MALKIN: None from the United States, Your Honor.

MR. CALLAGHAN: On behalf of the defendant, we did object to the records for an upward departure in Paragraph 87, but that's what we're going to argue today, I'm sure. So, I would just bring that to the Court's attention, and I do have one update for the Presentence Report, at whatever stage the Court

would like to hear that.

THE COURT: Well, now is as good a time as any.

MR. CALLAGHAN: Sure. Your Honor, if you'll look at Paragraph 55, that references a pending charge, which is no longer pending, and I'll explain to the Court what happened here.

Mr. Dotson hired somebody to drive him because they were going out in the evening and he did not want to be driving and run the risk of a DUI. The individual that drove him apparently went behind his back and drank and got pulled over. Mr. Dotson received a ticket for allowing a DUI. We fought that charge and the prosecutor actually dismissed it with prejudice on July 26, 2014.

For some reason unknown to me, the police officer then went and re-filed the very same charge the next day. So, it was dismissed with prejudice, so I brought that to the attention of Chuck Miller. Mr. Miller told me that he had submitted the paperwork. The magistrate in Kanawha County Circuit Court had that dismissed again with prejudice, so I'd point out that he is no longer -- or will no longer be charged with that offense.

THE COURT: All right. I appreciate that information. I, as a matter of practice, don't pay much attention to criminal history where there's no conviction involved anyway, but I appreciate the clarification.

With regard to the comment at the end of the Presentence Report regarding an upward departure, I would make two comments.

First of all, I'm not sure that that -- I'm not really sure that that's -- I understand we might have argument on that. I'm not sure that it's necessary to amend the Presentence Report on that and so, to the extent that that's an objection, I'll overrule it, and then we can still address it, if necessary, at a later time.

So I will adopt the Presentence Report and addendum as written.

I will note that I did receive sentencing memoranda from both sides.

I also received a number of letters from Mr. Callaghan and Ms. Malkin was copied on them.

You did receive those?

MS. MALKIN: I have, Your Honor.

THE COURT: Would you like me to make them a part of the record, Mr. Callaghan?

MR. CALLAGHAN: Yes, Your Honor.

THE COURT: Is there any objection?

MS. MALKIN: No, Your Honor.

THE COURT: All right. It will be so ordered.

On March 6, 2014, the defendant appeared before this Court and entered a plea of guilty to a single-count information which charges him with unlawful monetary transactions, or money laundering, in violation of 18 U. S. C. 1957. I deferred a factual basis at that time, having reviewed the facts in the case, and I -- I believe that there --

Well, first of all, I believe that the way it's charged, the underlying unlawful activity is a violation of 18 U. S. C. Section 1955 and, do the parties agree that the government would have to show proof that the elements of that offense are satisfied?

MR. CALLAGHAN: Yes, Your Honor.

MS. MALKIN: Yes, Your Honor.

THE COURT: All right. Having looked at the record, I think they are, except that I think this is implicit in the record, but I think it would be nice to nail this down today. Do we agree that this -- that this business that the defendant was running in South Williamson with the gray machines was in operation for a continuous period in excess of a month?

MR. CALLAGHAN: Your Honor, I've discussed that with compliant and he agrees that that is, in fact, the truth.

THE COURT: It looks like it was in operation from at least 2008 to 2013.

MR. CALLAGHAN: That's correct. Factually, it's 2008-13, that's correct, Your Honor.

THE COURT: In continuous operation?

MR. CALLAGHAN: Continuous operation.

THE COURT: Okay. Do you agree with that, Ms. Malkin?

MS. MALKIN: Yes. We agree with that, Your Honor, and I have reviewed records that show paychecks being paid throughout that period to employees that worked for that business.

THE COURT: Well, there were other aspects of that business that were legitimate, though, right?

MS. MALKIN: That's correct, Your Honor.

THE COURT: But Mr. Callaghan has agreed that the gambling part of the business was a continuous operation from 2008 to 2013, and you agree with that, as well?

MS. MALKIN: Yes, Your Honor, until October of 2013.

THE COURT: I did say "2013", didn't any?

MS. MALKIN: Yes.

THE COURT: Okay. Very well. I think that's satisfied.

I will find that there is an adequate factual basis for the charge to which the defendant has pled guilty and I will now adjudge him guilty of that crime and accept the plea agreement that was previously filed.

I'm now ready to give my tentative findings as to the applicable guidelines. I find a Base Offense Level of 8; plus 4 for the amount of money involved in this particular offense; plus 1 for a conviction under Section 1957, for an adjusted offense level of 13; minus 2 for acceptance of responsibility, for a Total Offense Level of 11; a criminal history category of I based on 0 criminal history points, yielding an imprisonment range of 8 to 14 months, but that does fall within Zone B, which allows for, among other things, certain alternatives, including probation with certain conditions of confinement.

The term of probation would be 1 to 5 years; supervised release, if imprisonment were imposed, would be 1 to 3 years; a fine range of $2,000.00 to $20,000.00; a mandatory special assessment of $100.00; and we have an agreement and an amended proposed order for $308,000.00 of forfeiture.

Are there any legal objections to my tentative findings as to the applicable guidelines?

MS. MALKIN: No, Your Honor.

MR. CALLAGHAN: No, Your Honor.

THE COURT: All right. Mr. Dotson, at this time, the Federal Rules of Criminal Procedure give you the right to make any statement that you would like to make, although you're not obligated to make any statement. However, if you do choose to make a statement, I would ask that you stand to do so.

THE DEFENDANT: I'm going -- excuse me. I'm going to do my best, Your Honor, and, if I can't, I'm going to ask Mr. Callaghan to read it for me.

Your Honor, first, I want to thank you and the court for allowing me the opportunity to speak here today. Second, I want you to know I am sorry for breaking the law and I take fully responsibility for my actions, knowing that my actions has placed a burden on the investigators, the U. S. Attorney's Office, and this Court, who I know have spent countless of hours dealing with what I created.

I, too, deal with what I've done every day. As a convicted

felon, I know I will no longer have the privilege to vote in hopes that the candidate I think would do the best job representing our community, our state, and our country, if elected.

As a convicted felon, I know I can no longer possess firearms, as a law-abiding citizen can, but what I deal with most, knowing that I spent -- I will spend the rest of my life being labeled as a felon.

My actions and the reality of what I have done have taken a mental toll on me. As well, through therapy, I'm doing -- learning how to deal with what my actions have caused, but the total of being a felon is something I have yet to come to grips on.

Not an hour goes by that I don't think about what my actions have caused my family and me. As a felon, I feel that I have done nothing but bring shame to myself and bring shame to my family.

Speaking of my family, I've been married to my wife Jeannie for 33 years. Together, we have two wonderful children, my daughter Bridgette, and my son Jonathan. Bridgette and Jonathan have blessed Jeannie and I with three wonderful grandchildren, Aidan, Jersey, and Jagger.

Your Honor, I can tell you the first thing that I think about when I wake up every morning and the very first thing that gets me out the door to work each day is the love of my family.

I can't imagine what it would be like not to see my wife, my children, my grandchildren, who I cherish. Without my family, I have no life.

When I was 20 years old, Jeannie and I took on a chance and devoted our lives to opening a restaurant called Giovanni's Pizza. We owned Giovanni's -- excuse me. We still own Giovanni's and, with the support of our family, our employees, and our customers, our business has grown to be part of Logan and surrounding communities who we serve.

As the owner of Giovanni's, I fully understand my actions. I have not only jeopardized my future and that of our family's, but it has also jeopardized the future of our 40 employees who work hard every day to keep our business running and growing. Again, I have only myself to blame.

Your Honor, I'm sure that during the time that you have served, you have seen many people break the law who accepted responsibility for their actions. Your Honor, I am one of those people. I realize I have made a bad decision and used very poor judgment.

I can assure you, whatever happens here today, I will not make these decisions again. I see now that I need to think about the consequences of my actions and make wiser choices. I want to thank my wife Jeannie, my daughter Bridgette, my son Jonathan, and the rest of our family and friends who have supported us during this dark time.

I want to thank Mr. Callaghan for representing me and I want to thank the investigators and the U. S. Attorney's Office for their dignity and respect. I feel they have acted in a professional manner throughout this process and I have great -- the greatest -- respect for them.

I also want to thank our community for the support they have given Jeannie and I during this dark time. It has been humbling, to say the least.

Your Honor, again, I stand here before you and accept responsibility for my actions, as I ask for forgiveness from my family, friends, and those who have stood by me. I respectfully ask you to take into consideration that I have accepted responsibility for the crime I've committed as you render your sentence here today, as I fully realize I have taken my future out of your hands -- out of my hands and placed it in yours.

I also ask you to take into consideration that I'm a small business owner and we do not have the luxury of having a team of managers to run Giovanni's. If I go to prison, as a small business owner, I am responsible for many of the day-to-day tasks that are necessary to keep our business running.

While I realize I made a decision to break the law, knowing it would place my freedom and our business in jeopardy, I do not want the future of my family and the future of our employees to suffer because of what I did. I only ask that you consider this. Thank you, Your Honor, for letting me be heard here today.

THE COURT: Thank you, Mr. Dotson.

Mr. Callaghan, I'll hear from you now. If you're planning on making a big argument against an upward departure, you don't need to. I'm not going to depart upward. So, if that helps you tailor your comments.

MR. CALLAGHAN: Your Honor, that takes 90 percent of the time away, so that's very good. I appreciate that. Thank you.

THE COURT: All right.

MR. CALLAGHAN: First of all, Your Honor --

THE COURT: Mr. Dotson, you may be seated.

THE DEFENDANT: Thank you.

MR. CALLAGHAN: Let me advise the Court, what Mr. Dotson read to you, he totally prepared himself. I had no involvement in preparing that. I did review that because, as a lawyer, I wanted to make sure he didn't say anything he shouldn't say or violate a term of the court, but every word in that was his own. None of those words were mine. So I think that's important for the Court to understand it does come from his heart.

In my memorandum, I made reference to what I call the School of Hard Knocks, and I don't know if the Court got my reference, but in Richwood, when I grew up, there was a guy named Jim Comstock, who was editor of the newspaper there and a very famous fellow, and he created what he called the "School of Hard

Knocks", and what it was, he called it a college and he would go around and find successful West Virginians, who had no formal education, did not have the benefit of a formal education, but yet, were successful people and contributed to the community in West Virginia. Were Mr. Mr. Comstock still around, I think we'd give Greg Dotson a degree from the School of Hard Knocks.

If you look at what Mr. Dotson has done, he came to Logan and, as I put in my memorandum, he came to Logan with his wife in a beat-up Chevette that literally had no passenger door on the car. That's how he started at roughly 20 years old, being married and trying to raise a family. He did it the hard way. He started by selling ice cream at a small ice cream stand and he works probably in the neighborhood of 20 hours day, and I can assure you he'll call me at odd hours, so I can tell you he's working very late at night and very early in the morning. So he's a very hard worker.

And, through that hard work, he developed Giovanni's Pizza in Logan and, as I put in the memorandum, it is the number one franchise of Logan -- or Giovanni's Pizza in the entire franchise system of Giovanni's. Giovanni's operates in six states and he is the number one franchise city and has been for many, many years.

So, as I say, he did it the hard way. He worked himself up and he has about 40 employees that depend on him for his day-to-day operations and, also, when I tried -- what I tried to

point out in the memorandum, Giovanni's is the majority of what Mr. Dotson has done. This brandishing and gambling stuff was a small side deal of what he has actually accomplished, as far as a businessman.

Again, he has 40 employees and, as you can see in the courtroom, he has a significant amount of family support and he has a significant amount of community support.

That being said, I submit to the Court that he is a low risk for being back in this court at any time in the future and the sentence I would ask for, Your Honor, is really the one that I think is appropriate, and it's a sentence of probation, with eight months of home confinement, to hit the low end of the number on the guideline range.

I have some cooperation issues to raise with the Court, but we're a little concerned about them becoming public at this stage. I don't know how we could address that, approach the bench, or -- I -- Mr. Dotson is ongoing cooperating with the government.

THE COURT: Well, if you want to approach the bench, you may.

MR. CALLAGHAN: Is that -- I'm concerned about the government. They don't want me to talk in public here today, so --

MS. MALKIN: The issue, Your Honor, is there is -- we have ongoing covert investigations that Mr. Dotson has provided

cooperation and I don't want any of those details, especially given the number of people in the courtroom, to be public at this time. If we could come forward to the bench with the white noise, or pink noise, or whatever that's called, that might be something, and then Mr. Callaghan can detail that, but I will tell the Court that we do agree that he has -- he is cooperating and has continued to do so throughout his case.

THE COURT: Well, I read the memos of the parties and I understand his prior cooperation. To the extent that he has ongoing cooperation, I see that there's no 5k motion. Is it possible there might be a Rule 35 motion at later time?

MS. MALKIN: That is possible, Your Honor.

THE COURT: Okay. You know, I don't know -- I mean, you're welcome to come up and here tell me what you want to, but under those circumstances, to the extent that it's going to have any bearing on my -- to the extent that it's going to have any sentencing decision, it's what's already occurred in the past that's going to have some bearing on my sentencing decision.

The way I approach ongoing cooperation is that, if you don't file a motion now, then I basically consider that later in the course of a Rule 35 motion. That's my approach to it anyway.

So, having said that, you're welcome to come up and tell me what you want to tell me. I don't know how much impact it's going to have on my sentencing decision.

MR. CALLAGHAN: I think we should, yes.

THE COURT: All right. You may -- you may approach. The defendant needs to come, too, though.

(At side-bar)

MR. CALLAGHAN: Your Honor, after Mr. Dotson's business was raided on October 6, 2013, within two weeks another person came into the exact location and put 45 more gray machines in the same place that Mr. Dotson operated. Mr. Dotson contacted me and the U. S. Attorney's Office, and I contacted the U. S. Attorney's Office and investigators. Mr. Dotson sent a person in, one of his employees, to play the machines and take a payout and we documented all of this and gave that information to the government. So he did more than just give information. He actively participated and tried to shut down this operation.

Secondly, there's an individual that owns this building that, by my account, knows that this is a gray machine operation and is profiting illegally. He has relayed that information, including leases and information that this individual knew that this was going on under his roof. So, it's more than just a -- you know, he certainly gave the government some information.

As I understand it, the ongoing investigation is continuing. Whether they end up charging someone or not, I have no control of that, but I thought it was important to note that it was more than just him giving information.

The other side of that --

THE COURT: This is in Kentucky, right?

MR. CALLAGHAN: In Kentucky, yes, Your Honor, and the other side of that, I tried to be very delicate in the brief when I said, you know, this is a crime, we certainly understand, but there's a certain amount of acceptance of this activity in Kentucky, and I will give you an example. Within 200 yards of where Mr. Dotson's place was in Kentucky, were are at least three other gambling operations that do the exact same thing and the attitude down there, and I referenced prior to, West Virginia, in our law, in Kentucky it's very similar.

There's one place that was right across the street from Mr. Dotson's operation. It is now the meeting place for the West Virginia State Police and the Kentucky State Police who have meetings right in front of the gray machines. So I tell you that just to put it into perspective of, in Kentucky, it's a whole different attitude than what you see in West Virginia. Not to diminish what Mr. Dotson did. He knew the rules, he violated them, but I just wanted to put that into perspective.

THE COURT: Ms. Malkin, anything to add to that?

MS. MALKIN: No. The summary Mr. Callaghan gave is accurate to the cooperation he has provided to this point. The investigation is very preliminary and, therefore, we're not at the point yet where we could file any kind of motion based on his assistance.

THE COURT: Okay.

MR. CALLAGHAN: Thank you, Your Honor.

THE COURT: Thank you.

(Side-bar concludes)

THE COURT: Does that conclude your remarks, Mr. Callaghan?

MR. CALLAGHAN: Yes, Your Honor.

THE COURT: All right. Very well.

Ms. Malkin, anything else to add,

MS. MALKIN: Your Honor, most of it is covered by my sentencing memorandum, but what I want to stress to the Court is the length of time that Mr. Dotson engaged in conduct that he knew was illegal. He's been involved in the gray machine business for at least a decade.

He cooperated in the Joe C. Ferrell investigation and was aware of the laws surrounding the gambling machines. He took over machines from Mr. Ferrell in 2008, and then continued to operate them illegally for over five years, taking money each week across the state lines. We've charged one particular time that he spent more than $10,000.00 of those illegal proceeds, but as the Court can see from the forfeiture, he profited to the tune of at least $300,000.00 from this illegal gambling business and he admitted in the Stipulation of Facts that he knew what he was doing was illegal over that course of time. So it's not simply one bad decision, it was decision to operate an illegal business for years.

In addition, you know, I don't deny the fact that he's a

small business owner, but he was funding some of that small business through illegal activities and this kind of activity has been rampant throughout West Virginia and, particularly in Southern West Virginia, and it's something that needs to be deterred, and I believe that a sentence within the guideline range -- excuse me -- guideline range with some period of imprisonment would be an effective deterrence in this case.

THE COURT: All right. Thank you, Ms. Malkin.

After consideration of the advisory guidelines and the other applicable factors from 18 U. S. C. Section 3553(a), I am ready to impose sentence. Will the defendant please stand?

Mr. Dotson, you were laundering money from an illegal gambling operation and that's a crime that calls for an appropriate penalty. I've given a lot of consideration to the nature of this offense, as well as your history and characteristics, including your assistance to law enforcement.

I have several observations. One is that, and I think I remember this from the plea hearing, that it appears to be undisputed that you pay taxes on all of these proceeds, which I found astonishing at the time of the plea hearing. I also note that you have very little criminal history.

This crime really boils down to state law. There's nothing illegal about buying a car for your son. What made this illegal, this transaction illegal, was that it was proceeds from an illegal gambling business that was -- that violated Section 1955.

Section 1955, in turn, is built upon state law.

Now, the approach of the state government in -- in West Virginia and, I guess, in Kentucky, as well, to gray machines is -- let's just say it's interesting. Obviously, Kentucky, they're still illegal. So if -- I would observe that -- and that's where this was taking place. So I would observe that if Kentucky was so concerned about it, Kentucky should have done something about it and, to the best of my knowledge, neither the state, the common laws of Kentucky, nor the federal government in Kentucky did anything about this, and I'm not in any way criticizing the charging decision in this case, by the way, but I'm simply noting my -- the context that I see this occurring in.

In West Virginia, you had the same situation that you have in Kentucky now for I don't know how long, maybe decades. These gray machines were in operation. Many people, probably hundreds, if not thousands of people in West Virginia, made money off of them and, for the most part, there was no enforcement even though they were illegal.

That came to a halt back in about 2001-2002, I don't remember exactly when it was, and the State's solution to that was, rather than enforce the law, we'll change it, make it legal, put some regulation on it and take our cover. And, so what I observed is that you were operating these gray machines in a jurisdiction that, at least in your case, didn't do anything about it and, if you had done it in West Virginia and had jumped

through the right hoops, it would have been perfectly legal.

So, with all of that in mind, I have crafted the sentence that I have. I find that there is very little need to protect the public from further crimes by you and I believe that the sentence that I have crafted will provide all of the deterrence that is necessary.

Therefore, it is the judgment of this Court that you be sentenced to a period of three years of probation.

(Multiple simultaneous comments from spectators)

THE COURT: I appreciate the sentiment, but this is a federal courtroom, and I'm not going to put up with that. The next peep I hear from anybody, all of you will be gone.

While you are on probation, you must not commit another federal, state or local crime; you must not possess a firearm or other dangerous weapon; and you must not unlawfully possess a controlled substance.

You also must comply with the standard terms and conditions of probation as recommended by the U. S. Sentencing Commission and as adopted by this Court, except that you need not participate in a program of testing, counseling and treatment for drug and alcohol abuse.

You also must abide by the special conditions of probation as set forth in the local rules of this court, and I'm also not going to impose a drug testing requirement.

I'm not going to impose a fine in this case. I believe that

you have agreed to a substantial forfeiture of assets adding up to, I believe, it's $308,000.00. I believe that that is a sufficient monetary penalty in this case.

A mandatory special assessment of $100.00 will be imposed. That has not been paid yet, has it, Mr. Callaghan?

MR. CALLAGHAN: I believe it has.

THE COURT: Has it?

MR. CALLAGHAN: Yes. I think we paid it on the plea date, is my recollection.

THE COURT: All right.

MR. CALLAGHAN: I recall walking in and paying it, yes, sir.

THE COURT: Now that you say that, I believe that's probably the case, and my courtroom deputy, I think, is indicating to me that it has been paid. All right. So we don't need to worry about that.

I did receive an amended order of forfeiture. I actually haven't had a chance to take a look at the amended order yet, but I imagine it's in -- Mr. Callaghan, have you seen it?

MR. CALLAGHAN: I don't know if I've seen the amended, but the first one was fine.

MS. MALKIN: The only -- excuse me, Your Honor. The only difference was on the last item on the list, which were gray machines, one set of the gray machines that were seized, there were also parts seized, and we had failed to include the parts in

the initial order and we wanted to include those so that we would be able to destroy the parts and not just the -- the gray machine parts.

THE COURT: And, just so I'm clear on the order, it lists a number of items and those items add up to $308,000.00?

MS. MALKIN: That's correct. It's a combination of cash, and then the car, and the other items listed.

THE COURT: All right. Well, I will take a look at that. I imagine I will be entering that in the next few days.

You may be seated.

Mr Dotson, there is a significant appeal waiver contained in your plea agreement. As qualified by that waiver, you have the right to appeal the judgment of this Court. Any Notice of Appeal must be filed with the Clerk not more than 14 days from the date of the entry of the judgment order.

If you desire counsel on appeal and you are not able to retain counsel, the appropriate Court will review a financial affidavit filed by you to determine whether or not to appoint counsel.

Do you understand your right to appeal and the 14-day filing requirement?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: All right. I will place the Presentence Report under seal subject to counsel's right to unseal as necessary for appeal.

Any other matters we need to take up in this case?

MR. CALLAGHAN: No, Your Honor.

MS. MALKIN: No, Your Honor.

THE COURT: All right. Thank you.

MR. CALLAGHAN: Thank you, Your Honor.

(Proceedings concluded at 3:05 p.m., October 2, 2014.)

CERTIFICATION:

I, Ayme A. Cochran, Official Court Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the matter of United States of America, Plaintiff v. Gregory A. Dotson, Defendant, Criminal Action No. 2:14-cr-00012, as reported on October 2, 2014.

s/Ayme A. Cochran, RMR, CRR — December 17, 2014

Ayme A. Cochran, RMR, CRR — DATE